UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE:

DWAYNE E. McCLELLAND,

    Debtor

_____

UNITED STATES OF AMERICA,
    Plaintiff

vs.

DWAYNE E. McCLELLAND,
    Defendant

Chapter 7

Bankruptcy No. 19-01695

Adversary No. 20-09010

## RULING ON COMPLAINT TO DETERMINE DISCHARGEABILITY

This adversary proceeding was filed by the United States Social Security Administration ("SSA") to determine the dischargeability of certain overpayment debts owed by Debtor-Defendant Dwayne McClelland. The SSA asserts that McClelland intentionally and fraudulently withheld information about his ability to work and his work activities from the SSA and improperly received Social Security Disability Insurance benefits ("SSDI"). The SSA asks this Court to find the overpayment debt of $63,445.40 to be non-dischargeable under 11 U.S.C. 523(a)(2)(A).

The Court held a hearing in June 2022 and issued an opinion holding $27,868.30 of the total overpayment amount to be non-dischargeable and $35,577.10

to be dischargeable.  The SSA timely appealed.  On September 14, 2023, the United States District Court for the Northern District of Iowa (Strand, J.) reversed and remanded.  On April 18, 2024, the Court held a supplemental evidentiary hearing and took the matter under advisement on the briefs submitted.

### REGULATORY BACKGROUND

The SSA provides SSDI benefits to "insured" individuals who have paid the Social Security tax on their earnings. 20 C.F.R. § 404.130.  SSDI benefits are payable to individuals who are "disabled" as defined in 20 C.F.R. § 404.1505.  An individual is "disabled" when they are unable to engage in substantial gainful activity ("SGA"). Id. See also id. § 404.1572.

SSDI beneficiaries may take part in a "trial work period," ("TWP") during which an individual may "test [their] ability to work and still be considered disabled." Id. § 404.1592(a).  The TWP may extend for "as many as 9 months, but these months do not have to be consecutive." Id.  SSDI beneficiaries are entitled to receive the full amount of their benefits during the TWP, regardless of how much they earn.  An extended period of eligibility ("EPE") begins the month after the TWP ends and may last as long as thirty-six months. Id. § 404.1592a(b).  The EPE allows beneficiaries to continue working without losing their SSDI benefits. Id.  However, if a beneficiary's income exceeds the SGA threshold during the EPE, their benefits will be suspended. Id. § 404.1592a(a)(1).

2

The SSA continues to provide SSDI benefits during the first month the beneficiary's income exceeds the SGA threshold and for two consecutive months thereafter. Id. § 404.1592a(a)(2). The beneficiary's eligibility for SSDI benefits is suspended for the remainder of the thirty-six-month EPE to the extent the beneficiary's income exceeds the limit. Id. §§ 404.1592a(a)(2), 404.316, 404.337, 404.352, 404.401a. "Overpayment" occurs when the amount of benefits paid to a beneficiary exceeds the amount of benefits the beneficiary was entitled to receive. Overpayments include payments made during the period in which a beneficiary's eligibility is suspended. Beneficiaries are required to repay overpayments. Id. § 404.501(a). However, beneficiaries may seek a waiver of the overpayment fees if they are "without fault" or "if adjustment or recovery would either defeat the purpose of title II of the [Social Security] Act, or be against equity and good conscience." Id. § 404.506.

### FINDINGS OF FACT

In May 2010, McClelland applied for SSDI and Child's Insurance Benefits. The SSA awarded McClelland $1,338.00 in monthly SSDI and $334.00 in monthly child's benefits as representative payee. The notice stated that the decision was based on the information he had provided, and that he was required to report any changes in his information to the SSA. A pamphlet provided McClelland with "need

3

to know" information about receiving SSDI benefits, which included what information must be reported to the SSA and how to report it.

McClelland triggered his TWP in October 2010, when he began working for Tradesman International, LLC. ("Tradesman"). Between October 2010 and June 2011 (the nine-month TWP), he earned wages from Tradesman, Loadcraft Industries Ltd. ("Loadcraft"), and McCarty Corporation ("McCarty"). McClelland's EPE began in July 2011. He then earned wages from A-One Plus Home Health Care LLC ("A-One") and Eagle Systems between July 2011 and June 2012. The wages paid to him by Eagle Systems exceeded the income limit—had they been reported, his benefits would have been suspended at that time.

In December of 2012, the SSA discovered unreported employment and earnings on his Social Security Record, prompting it to request that he complete a Work Activity Report to verify his earnings. The SSA's records reflected that he had worked for the following employers: Akima Construction Services, Tradesman, Eagle Systems, McCarty, Loadcraft, and A-One. McClelland completed the Work Activity Report that same month, reporting earnings from each employer listed in the SSA's letter, excluding Tradesman. After completing the Report, he reported no additional work activities from January 2013 to November 2016.

On October 17, 2013, the SSA sent McClelland a Notice of Proposed Decision, informing him that it had reviewed his earnings for the period February 2010 through

4

October 2013.  Because the SSA found that his work during this period did not

constitute SGA, he was entitled to temporarily continue receiving his benefits until

a final decision was made.

The following month, the SSA issued a final decision regarding McClelland's

disability status.  In its November 23, 2013, Notice of Disability Cessation, the SSA

informed him of the following:

> We have decided that your disability ended because of your substantial work as of July 2011.
> Usually, we would stop your payments since it appears your work was substantial as of July 2011.  However, based on the information we have, we will keep paying you. This is because it appears your work is not substantial after September 2011.

> **Information About Your Payments**

> Your payments continued during your period of 9 trial work months while you tested your ability to work.  Your trial work period ended June 2011.

> **What Happens After The Trial Work Period**

> After the trial work period, several things happen.

> - Your disability ends if your work activity shows your ability to do substantial work.  However, we pay benefits for the month disability ends and the following 2 months no matter how much is earned.  In your case, this is July 2011 through September 2011.
> - You get an extended period of eligibility that begins right after the trial work period.  This is a 36-month period when we restart payments for any month(s) your work is not substantial if your health problems still meet our rules.  Your extended period of eligibility months are July 2011 through June 2014.

From November 2013 to June 2016, there appears to have been no contact between the SSA and McClelland. The SSA argues that during this time period, he worked for Ice Card, Inc. (d/b/a Barracuda Group) ("Barracuda"), Uni-Form Components Co. ("Uni-Form"), Trinity Industries Ltd. ("Trinity"), and Pepsico, Inc. ("Pepsi").

On June 4th, 2016, the SSA notified McClelland that it would be reviewing his record to determine whether or not he was still disabled. The SSA issued a final decision a few months later in September 2016, advising him that his benefits would be terminated in November 2016 because he was no longer disabled based on his ability to work.

McClelland later reapplied for SSDI in January of 2017, including the following in his application: "I do not agree with my earnings as posted. I believe my brother has used my social security number, including for work purposes. I will make an appointment with Social Security to review my earnings record." In a signed statement made on January 19, 2017, McClelland certified that he did not work for the following employers: Trinity, Uni-Form, Barracuda, Tres Aguilas Enterprises LLC, Artco-Bell Corporation, Eagle Systems, Loadcraft, A-One, Tradesman, McCarty. He requested that the SSA remove the respective earnings from his record.

In June 2017, the SSA sent McClelland a Notice of Disability Cessation and a Notice of Change in Benefits informing him that his benefits would be terminated retroactively to an earlier date of July 2014 and that he had received approximately $63,445.40 of overpayments. This amount included $53,651.40 to him personally and $9,794.00 to him as representative payee of his minor child. McClelland pursued a waiver, but that waiver was denied when he failed to appear for his personal conference with the SSA. He did not take any further action to dispute that he owed the $63,445.40 of overpayments. He filed a Chapter 7 Petition on December 3, 2019. (Bankr. No. 19-01695). On March 13, 2020, the SSA filed this adversary proceeding to determine the dischargeability of the overpayment amount owed by him.

## DISCUSSION

A. <u>Jurisdiction</u>

The issue of jurisdiction has already been addressed by this Court. <u>See</u> <u>United States v. McClelland</u> (<u>In re McClelland</u>), Ch. 7 Case No. 19-01695, Adv. No. 20-09010, 2021 Bankr. LEXIS 2717, at *7. This Court has jurisdiction to determine whether the debt owed by McClelland is non-dischargeable under 11 U.S.C. § 523(a)(2)(A), though the Court lacks the authority to review the factual findings of the SSA.

B. <u>11 U.S.C. 523(a)(2)(A)</u>

The SSA argues that the full amount of McClelland's overpayment is non-dischargeable because he failed to report his income and employment and proceeded on false pretenses to receive benefits he was not entitled to.  McClelland counters that he did not have the requisite intent to deceive the SSA, that he did not work for several of the employers in the SSA's records, and that his identity had been stolen.

A Chapter 7 discharge will generally relieve a debtor "from all debts that arose before the date of the order for relief." 11 U.S.C. § 727(b).  However, the Bankruptcy Code excepts from discharge any debts obtained through "false pretenses, a false representation, or actual fraud." Id. § 523(a)(2)(A).  For a debt to be non-dischargeable due to false pretenses, the plaintiff-creditor must establish, by a preponderance of the evidence, that its claim falls within the exception to discharge. Grogan v. Garner, 498 U.S. 279, 291 (1991); Treadwell v. Glenstone Lodge (In re Treadwell), 637 F.3d 855, 860 (8th Cir. 2011).  This requires a showing that (1) the debtor made a representation, (2) with knowledge of its falsity at the time it was made, (3) deliberately for the purpose of deceiving the creditor, (4) the creditor justifiably relied on the representation, and (5) that the creditor sustained the alleged loss as a proximate result of the representation. Hernandez v. Gen. Mills Fed. Credit Union (In re Hernandez), 860 F.3d 591, 602 (8th Cir. 2017) (citing Heide v. Juve (In re Juve), 761 F.3d 847, 851 (8th Cir. 2014)).

*1. Representation*

8

The debtor's representation need not be an affirmative one.  A false pretense may arise from "silence when there is a duty to speak." United States v. Drummond (In re Drummond), 530 B.R. 707, 709 (Bankr. E.D. Ark. 2015) (quoting Check Control v. Anderson (In re Anderson), 181 B.R. 943 (Bankr. D. Minn. 1995)). "Bankruptcy courts have overwhelmingly held that a debtor's silence regarding a material fact can constitute a false representation actionable under section 523(a)(2)(A)." In re Van Horne, 823 F.2d 1285, 1288 (8th Cir. 1987), *abrogated in part on other grounds by* Grogan v. Garner, 498 U.S. 279 (1991). See also United States v. Sower, 2014 Bankr. LEXIS 5416 at *6 ("The debtor's silence as to his work activity constitutes a representation under the circumstances."); In re Hatcher, 111 B.R. 696, 700 (Bankr. N.D. Ill. 1990) (finding debt for overpaid public assistance benefits excepted from discharge where debtor's acceptance of the benefits was tantamount to an intentional false representation that she remained unemployed).

In this case, McClelland understood that the SSA's decision to award SSDI benefits was based on the representations he made in his initial application.  He also understood that he had a duty to notify the SSA if his health improved or if he was able to return to work.  The SSA explained: "You are responsible for telling us if your medical condition improves, if there is any change in your ability to work or if you return to work," and that "if you do not report a change, it may result in your being paid too much.  If you are overpaid, you will have to repay the money."  The

9

record shows, and McClelland admits, he did not notify the SSA when he returned to work on several occasions—the reporting of which would have led to a timely termination of his benefits. The Court finds that McClelland had a duty to disclose his employment and his failure to report such information to the SSA constitutes a false representation or omission under § 523(a)(2)(A).

2. *Knowledge of its falsity*

The SSA must next prove that he knew the representation was false at the time it was made. He admits to falsely representing that he was not working from September 2015 to November 2016, and that during this time he was employed by Pepsi. He now argues only that his representation that he did not work for Barracuda, Uni-Form, and Trinity was not false and claims someone stole his identity and worked those jobs. The Court does not find this argument to be credible.

McClelland testified that he could not remember working for the three employers at issue, so someone other than himself must have done so. However, he also testified that he could not recall a time period where he was *not* working and acknowledged his signature on numerous documents that suggest he did in fact work each of the three jobs.

Barracuda

Barracuda certified to the SSA that it had employed McClelland from February 2014 through May 2014. He listed Barracuda as a previous employer on a

form submitted to Pepsi during his employment and admitted that he must have if that is what he represented to Pepsi. The SSA has established that McClelland worked at Barracuda during the relevant period.

Trinity Industries

McClelland acknowledged his signature on a job application to Trinity and a request for time off from Trinity to defend a traffic ticket. The driver's license number listed on the traffic ticket was the same as the driver's license McClelland had previously submitted to employers he admits working for. When he left his employment at Trinity, he provided his address in Chicago as a forwarding address. This establishes that he worked at Trinity during the relevant period.

Uni-Form Components

McClelland argues that he could not have worked for Uni-Form during the period alleged because he was no longer living in the area. In addition, he claims that he never had an account at the bank where the Uni-Form payroll was direct deposited. He asserts that someone other than himself opened the bank account, deposited paychecks into the account, and forged his signature. He points out that he never listed Uni-Form on his resume or on his job application for Pepsi in 2016. He claims that he took action when he discovered the alleged identity theft in 2018 by filing a police report.

The SSA points out that employment records show that McClelland worked as a welder for both Barracuda and Trinity—the same position Uni-Form's records show he held at Uni-Form.  The emergency contact information and driver's license number listed on the Uni-Form job application were also in the records of his other previous employers.  He provided the bank with the same address on the Uni-Form application.  That same bank account received direct deposits from Uni-Form and directed payments to McClelland's ex-wife.  This documentary evidence establishes that he worked at Uni-Form during the relevant period.

The weight of the evidence shows that McClelland worked for the disputed employers and  knew that his representation to the SSA that he was not working was false.

3. *Intent to Deceive*

The third element the SSA must show is that McClelland made the representation deliberately with an intent to deceive.  "All [the intent element] requires is a showing of an intent to induce the creditor to rely and act on the misrepresentations in question." Merchs. Nat'l Bank v. Moen (In re Moen), 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999).

> Because direct proof of intent (i.e., the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred.  When the creditor introduces circumstantial evidence proving the debtor's intent to deceive, the debtor "cannot overcome [that] inference with an unsupported assertion of honest intent."  The focus is, then, on whether

the debtor's actions "appear so inconsistent with [his] self-serving statement of intent that the proof leads the court to disbelieve the debtor."

Southeast Neb. Coop. Corp. v. Schnuelle (In re Schnuelle), 441 B.R. 616, 622 (B.A.P. 8th Cir.) (citing In re Van Horne, 823 F.2d 1285, 1287–88 (8th Cir. 1987) (citations omitted).

McClelland admitted that he understood the reporting requirements and that his benefits were based on the information he provided to the SSA. It is undisputed that had he reported his employment as required, his benefits would have been terminated earlier. This supports an inference that McClelland acted deliberately with an intent to decieve.

### 4. Justifiable Reliance

The fourth element is whether the SSA justifiably relied on McClelland's representation (or lack thereof). In similar cases, bankruptcy courts have found that the SSA is justified in relying on SSDI recipients to report their employment because the SSA does not have the manpower to monitor each case. United States v. Pipkin (In re Pipkin), 495 B.R. 878, 881 (Bankr. W.D. Ark. 2013); In re Drummond 530 B.R. 707, 710 (Bankr. E.D. Ark. 2015). The Court applies the same standard here.

A claims specialist for the SSA testified that the SSA relies on recipients to report employment to avoid enormous delays in getting such information from the IRS. The SSA field office that processed his initial applications employs only ten

people to serve nearly forty-six thousand beneficiaries. The claims specialist testified that even if the SSA learns of potentially unreported wages, it can be months or years before the SSA is able to investigate or follow up. The Court finds that the SSA justifiably relied on McClelland's representation that he was not working during the relevant time periods.

*5. Proximate Cause*

The SSA must also show proximate cause as the fifth element of its case. Here, the SSA overpaid McClelland $63,445.40 due to his failure to report his employment. The SSA would not have sustained such a loss but for his misrepresentations. For this reason, the SSA has established the fifth element of its case.

CONCLUSION

For the foregoing reasons, the Court finds that the SSA has proven by a preponderance of the evidence that McClelland obtained $63,445.40 from the SSA under false pretenses with the intent to deceive the SSA, that the SSA justifiably relied on him to report his employment information, and that the SSA sustained a loss of $63,445.40 as the proximate result of McClelland's failure to notify the SSA.

**IT IS HEREBY ORDERED** that the SSA's claim against the Debtor is non-dischargeable under 11 U.S.C. § 523(a)(2)(A).

Ordered:

September 5, 2024

Thad J. Collins
Chief Bankruptcy Judge